IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| KEYONNA BRYANT, TEMEKA DAVIS, and DANA DEMOSS, | ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. _____ |
| v. | ) ) | JURY DEMANDED |
| BELLSOUTH TELECOMMUNICATIONS, LLC, d/b/a AT&T TENNESSEE, | ) ) ) | |
| *Defendant*. | ) ) | |

## COMPLAINT

Plaintiffs Keyonna Bryant ("Ms. Bryant"), Temeka Davis ("Ms. Davis"), and Dana Demoss ("Ms. Demoss") (collectively, the "Plaintiffs") allege the following claims against Defendant BellSouth Telecommunications, LLC d/b/a AT&T Tennessee ("Defendant" or "AT&T"):

1.      This is an action for unlawful employment practices under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*, the Americans with Disabilities Act (the "ADA"), as amended by the Americans with Disabilities Amendments Act of 2008 (the "ADAAA"), collectively referred to herein as the "ADA," 42 U.S.C. § 1201, *et seq.*, and the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, *et seq*.

2.      Specifically, AT&T intentionally segregated employees in its Nashville office— including all three Plaintiffs in this case—who had disabilities and/or who requested FMLA-protected leave. After segregating these employees, AT&T gave them less favorable assignments and began retaliating against them, including by making serious (and false) allegations of fraud.

AT&T then terminated the segregated employees in a trumped-up reduction-in-force, while simultaneously continuing to hire for positions that were: (a) identical to the segregated employees' allegedly "eliminated" positions; or (b) different positions the segregated employees were qualified for.

## PARTIES, JURISDICTION, AND VENUE

3.     Ms. Bryant is a citizen of the State of Texas.

4.     Ms. Davis is a citizen of the State of Tennessee and resides in Davidson County, Tennessee.

5.     Ms. DeMoss is a citizen of the State of Tennessee and resides in Davidson County, Tennessee.

6.     Defendant BellSouth Telecommunications, LLC is a Georgia limited liability company with a principal address of 1025 Lenox Park Blvd. NE, Atlanta, GA, 30319.

7.     Defendant's registered agent is CT Corporation System, 300 Montvue Road, Knoxville, TN 37919.

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343(a)(4).

9.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to this action occurred within this District.

10.     Ms. Bryant filed two Charges of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") within 300 days of the unlawful employment practices that are the subject of this Complaint. She has received a Right to Sue from the EEOC for one Charge. Ms. Bryant intends to amend this Complaint upon administrative exhaustion of her remaining claims under the ADA.

11. Ms. Davis filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") within 300 days of the unlawful employment practices that are the subject of this Complaint. Her Charge is still pending with the EEOC, and Ms. Davis intends to amend this Complaint upon administrative exhaustion of her claims under the ADA.

12. Ms. DeMoss filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") within 300 days of the unlawful employment practices that are the subject of this Complaint. Her Charge is still pending with the EEOC, and Ms. DeMoss intends to amend this Complaint upon administrative exhaustion of her claims under the ADA.

## STATEMENT OF FACTS

### FACTS COMMON TO ALL PLAINTIFFS

13. AT&T operates a telecommunication network that spans the states of Alabama, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, and Tennessee.

14. AT&T divides its employees into organizational units.

15. Pursuant to a Collective Bargaining Agreement between the Communication Workers of America and Bellsouth Telecommunications, LLC, an "organizational unit" is defined for purposes of a force adjustment as "the employees who fall in the chain of command of the direct report of a direct report to the CEO of AT&T Communications."

16. Prior to August 2020, all Plaintiffs worked for AT&T in its location in downtown Nashville in the "Batman" building. All Plaintiffs were a part of the same organizational unit because they all reported to the same "direct report of a direct report to the CEO."

17. Plaintiffs' organizational unit spanned the states of Alabama, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina and Tennessee.

3

18.     Prior to August 2020, approximately 150 Nashville-based employees belonged to Plaintiffs' organizational unit.

19.     All the Nashville-based employees in Plaintiffs' organizational unit were trained to handle multiple types of sales for AT&T, including sales for landlines (referred to as "Telco" sales by AT&T), cellular, internet, and Voice Over Internet ("VOIP") services. Employees received commissions for cellular, internet, and VOIP sales, but did not receive commissions for Telco sales. The employees also helped customers with billing questions.

20.     During this time period through the present, Telco sales declined while cellular and internet sales increased.

21.     In or around August 2020, AT&T divided the Plaintiffs' former Center into two separate Centers, referred to in this Complaint as "Center A" and "Center B."

22.     Only approximately 40 employees were reassigned to Center A.

23.     All three Plaintiffs were reassigned to Center A.

24.     Approximately 80% of the employees assigned to Center A, including all three Plaintiffs, have serious health conditions and/or medical conditions that substantially limit one or more of their major life activities and/or had taken FMLA leave.

25.     Most of the employees in Center B, however, did not have serious health conditions and/or medical conditions that substantially limit one or more of their major life activities.

26.     Initially, the Center A employees handled the same sales and billing question calls as Center B employees.

27.     As time progressed, AT&T began routing the Telco sales calls to Center A. Center B did not handle any Telco sales calls. Each Telco sales call took about an hour. Furthermore, a

4

higher percentage of the Telco calls (as compared to other types of calls) were made for the purpose of cancelling services.

28.    The routing of Telco sales calls to Center A resulted in significantly reduced commissions for the employees in Center A.

29.    Further, as employees would leave their employment in Center A they were not replaced.

30.    In March 2023, AT&T told all the employees in Center A it was laying them off effective June 24, 2023.

31.    Approximately one month before the effective date of the layoff, Catherine Bareiter ("Ms. Bareiter"), Center B's manager, stated she needed to hire additional employees for Center B.

32.    Ms. Bareiter stated, however, she did not want to hire Center A employees for the vacancies in Center B because of their "bad attendance habits" due to their disabilities and/or serious health conditions.

33.    All three Plaintiffs were qualified for the vacancies in Center B and had performed these jobs in the past.

34.    Under the Collective Bargaining Agreement, Plaintiffs had seniority rights to transfer to Center B instead of being laid off. When AT&T told Plaintiffs it was laying off the employees in Center A, Plaintiffs requested their seniority rights to transfer to Center B; AT&T said that when the reporting structure changed, they lost those rights.

35.    AT&T told the Center A employees they could only transfer to distant locations, such as Miami, Florida.

36.    The employees in Center B were not laid off.

5

37.     The business day after the effective date of the layoff of the Center A employees, AT&T posted advertisements for available jobs that were nearly identical to the positions previously held by the employees in Center A and paid approximately the same amount as the jobs in Center A paid.

38.     On June 28, 2023—four days after the effective date of the layoff—AT&T held a job fair. The available jobs at the job fair included jobs that were both nearly identical to the positions previously held by the employees in Center A, as well as different jobs that the employees in Center A were qualified to perform.

39.     On July 22, 2023, AT&T held another job fair. The available jobs at the job fair included jobs that were both nearly identical to the positions previously held by the employees in Center A, as well as different jobs that the employees in Center A were qualified to perform.

40.     All three Plaintiffs were qualified to perform these jobs posted by AT&T.

41.     After the layoffs, all three Plaintiffs were placed in a job bank and should have been considered for the job vacancies described above; however, AT&T did not hire them.

<u>FACTS RELATED TO MS. BRYANT</u>

42.     Ms. Bryant worked for AT&T as a Sales Consultant in the Customer Advocacy and Service Department from April 26, 2015 until June 24, 2023.

43.     Ms. Bryant took FMLA leave: (1) in October 2017 when her son tore his anterior cruciate ligament ("ACL") and meniscus; (2) for a hysterectomy in 2020; and (3) intermittent FMLA for anxiety in 2019 which led to FMLA leave and/or short-term disability leave from November 9, 2020 until March 26, 2021 and intermittent leave thereafter.

44.     In Spring 2022, Ms. Bryant developed tendonitis in her right wrist that required surgery.

45.     Ms. Bryant's tendonitis substantially limited her major life activities, including the major bodily functions of her musculoskeletal system.

46.     Ms. Bryant's tendonitis required continuing treatment by a health care provider.

47.     Ms. Bryant told AT&T about the tendonitis; that she needed surgery for the tendonitis; and that she needed time off work for both the surgery and to recover from the surgery.

48.     Ms. Bryant asked AT&T for time off work to attend a pre-surgery doctor's appointment related to the tendonitis.

49.     Prior to attending the pre-surgery appointment, Ms. Bryant complied with AT&T's procedural requirements for requesting leave under the FMLA.

50.     Ms. Bryant was entitled to leave under the FMLA.

51.     AT&T later told Ms. Bryant it did not classify her pre-doctor's appointment as FMLA-protected leave because she submitted her FMLA paperwork to the "wrong system." AT&T told Ms. Bryant she needed to submit *different* paperwork to request a "reasonable accommodation" for her absence for the pre-surgery doctor's appointment. After Ms. Bryant followed instructions and submitted AT&T's "reasonable accommodation" request paperwork, AT&T denied Ms. Bryant's request for a reasonable accommodation, stating she should have instead submitted its FMLA paperwork—*which she originally did*.

52.     Ms. Bryant's experience described above is an example of the convoluted and byzantine system AT&T subjects its employees to when they request leaves of absence pursuant to the FMLA and/or as a reasonable accommodation under the ADA.

53.     After Ms. Bryant's surgery, she took leave under the FMLA and as a reasonable accommodation under the ADA to recover from her surgery. Part of Ms. Bryant's leave was compensated through her short-term disability insurance.

7

54.     On or around October 21, 2022—after Ms. Bryant returned to work from her leave of absence—she submitted a request for a standup desk and periodic breaks as reasonable accommodations for her disability (the "October 2022 Request"). In the October 2022 Request, she also requested intermittent leave through March 19, 2023 under the FMLA and/or as a reasonable accommodation for her disability.

55.     On October 21, 2022—the same day that Ms. Bryant provided the October 2022 Request—AT&T disciplined Ms. Bryant based on a false accusation of "short-term disability fraud." Specifically, AT&T claimed that Ms. Bryant impermissibly worked for her personal cleaning business. AT&T later also claimed Ms. Bryant had traveled overnight while receiving short-term disability payments.

56.     AT&T's false allegation of "short-term disability fraud" resulted from AT&T's surveillance of Ms. Bryant's social media accounts while she was on FMLA leave. Ms. Bryant restricted access to her social media accounts to "friends" or "followers," which did not include management-level agents of AT&T.

57.     As a result of AT&T's false allegation of "short-term disability fraud," the approval of Ms. Bryant's short-term disability benefits was overturned and AT&T garnished Ms. Bryant's wages to recoup her short-term disability benefits.

58.     AT&T also reported the garnishment to credit bureaus; this negatively impacted Ms. Bryant's credit rating.

59.     After conducting a review, Sedgwick Claims Management Services ("Sedgwick"), the third-party company that administers AT&T employees' requests for FMLA and/or short-term disability leave, overturned the denial of Ms. Bryant's short-term disability benefits and told

8

AT&T to return the money it garnished from Ms. Bryant's paycheck. Furthermore, the disciplinary action issued by AT&T was removed from Ms. Bryant's personnel file.

60. On November 9, 2022, AT&T sent Ms. Bryant an email stating that her request for FMLA leave from June 12, 2022 through July 15, 2022 was "pending" and her request for FMLA leave from July 16, 2022 through September 22, 2022 was denied.

61. AT&T then retaliated against Ms. Bryant by issuing her warnings (including on November 16, 2022) for alleged attendance infractions. These alleged attendance infractions included absences for days when Ms. Bryant was on approved FMLA leave and/or leave as a reasonable accommodation under the ADA for recovery from her surgery.

62. Additionally, the November 16, 2022 warning was based on absences resulting from the periodic breaks and/or leave she requested in the October 2022 Request. Simultaneously with issuing Ms. Bryant the November 16, 2022 warning, AT&T told Ms. Bryant (for the first time) it was denying her October 2022 Request.

63. AT&T told Ms. Bryant her October 2022 Request was denied "because of insufficient medical [*sic*]," even though Ms. Bryant submitted her requests on a form promulgated by AT&T that was completed and signed by her orthopedic surgeon. AT&T never asked Ms. Bryant for additional information or medical documentation before denying her requests.

64. On February 1, 2023, Ms. Bryant emailed AT&T and complained about its discriminatory practices.

65. After the June 2023 layoffs, Ms. Bryant applied for more than one hundred jobs with AT&T but was only offered a job in Oklahoma. Ms. Bryant reasonably declined that job because it would require relocation.

9

66.     One of AT&T's managers then told Ms. Bryant they wanted to hire her for a remote position; however, AT&T then told Ms. Bryant she was ineligible for the job because of the disciplinary action related to the false allegations of "short-term disability fraud."

67.     In response, Ms. Bryant told the interim Sales Center Manager, Susan Hennegan, that AT&T previously agreed to remove that disciplinary action from her file. In response, Ms. Hennegan said the removal of the disciplinary action was at her sole discretion and refused to consider Ms. Bryant for the remote position.

68.     Ms. Bryant then applied for a job in Center B. As discussed above, the manager over Center B previously stated she did not want to hire employees who took FMLA and/or short-term disability leave.

69.     AT&T told Ms. Bryant she was "not qualified" for the job in Center B, even though she performed the same tasks as the Center B employees when she worked in Center A.

70.     When Ms. Bryant asked AT&T why she was "not qualified" for the job in Center B, AT&T could not provide an answer.

71.     AT&T then pivoted and told Ms. Bryant she could not have a job in Center B because of the retaliatory and false "fraud" allegation described above, even though AT&T previously told Ms. Bryant it previously removed the "fraud" allegation from her personnel file.

72.     In August 2023, after Ms. Bryant applied unsuccessfully for more than a hundred jobs with AT&T, it hired Ms. Bryant for a job in its collections department.

73.     On August 7, 2023—her first day working in her new position—AT&T fired her in the middle of her shift.

10

74.     AT&T said it was terminating her for "unsatisfactory attendance and punctuality." In Ms. Bryant's personnel record, however, it states Ms. Bryant's job offer was "rescind[ed] . . . due to previous warning on employee's record."

75.     AT&T told Ms. Bryant the "previous warning" was an April 13, 2022 write-up. Upon information and belief, that "write-up" was related to Ms. Bryant's absence from work for her pre-surgery doctor's appointment in Spring 2022.

76.     As described above, Ms. Bryant complied with AT&T's procedural requirements for requesting leave under the FMLA for her absences related to her tendonitis, including her pre-surgery doctor's appointment. After AT&T refused to classify Ms. Bryant's absence for her pre-surgery appointment as an FMLA-covered absence, Ms. Bryant also complied with AT&T's instructions for requesting an excused absence as a reasonable accommodation under the ADA to attend the doctor's appointment. AT&T then denied that request, telling Ms. Bryant she should have submitted a request for an FMLA-excused absence—*which is what she originally did*.

77.     Even if an alleged April 13, 2022 write-up related to Ms. Bryant's absence for the pre-surgery doctor's appointment was legitimate—which it was not—AT&T removes attendance infractions from employees' record after one year. Any alleged infraction in April 2022 should have been removed from Ms. Bryant's record by April 2023 pursuant to AT&T's own policies.

78.     AT&T later blamed its termination of Ms. Bryant on the November 16, 2022 attendance warning. Not only was the November 16, 2022 attendance warning retaliatory, but it was the direct result of AT&T's failure to engage in the interactive process, as required by the ADA. Additionally, the November 16, 2022 attendance warning specifically cited days when Ms. Bryant was on FMLA-qualified leave of absence (to recover from surgery) as grounds for issuing the warning.

79.     Ms. Davis worked as a Sales Associate for AT&T from February 2006 until June 24, 2023.

80.     In the early 2010s, Ms. Davis developed severe migraines.

81.     The migraines substantially limited her major life activities, including concentrating, thinking, communicating, interacting with others, and the major bodily function of her neurological system.

82.     The migraines required continuing treatment by a health care provider.

83.     Ms. Davis was eligible for leave under the FMLA.

84.     Ms. Davis took intermittent FMLA leave for the migraines beginning in 2013.

85.     Ms. Davis submitted an FMLA certification form, signed by her doctor, requesting intermittent leave for her migraines on October 21, 2023.

86.     Ms. Davis's supervisor frequently told Ms. Davis that when she took FMLA leave, it negatively impacted Center A's metrics. Her supervisor told her this negatively impacted her pay, as well as the pay of the other Center A employees. These comments were continuous and occurred until shortly before the effective date of the layoff of the Center A employees.

87.     These comments made Ms. Davis feel extremely upset and guilty and had the effect of discouraging Ms. Davis from taking intermittent FMLA leave, even when she felt extremely ill. Furthermore, at least one management-level employee overheard Ms. Davis's supervisor making these derogatory statements and became upset because they did not think the supervisor's comments were appropriate.

88.     After the layoff, Ms. Davis's supervisor told her that AT&T would not rehire her for another job because of her "attendance issues" (*e.g.*, her need for intermittent leave under the FMLA and/or as an accommodation for her disability under the ADA).

89.     Ms. Davis was eventually hired into another position with AT&T; that position pays approximately ten percent less than she made working in Center A.

FACTS RELATED TO MS. DEMOSS

90.     Ms. DeMoss worked as for AT&T from September 12, 2016 until June 24, 2023.

91.     Ms. DeMoss lives with generalized anxiety disorder ("GAD") and depression.

92.     Both conditions substantially limit one or more of her major life activities, including concentrating, thinking, communicating, and interacting with others, and the major bodily function of her neurological system.

93.     Both conditions require continuing treatment by a health care provider.

94.     Ms. DeMoss was eligible for leave under the FMLA.

95.     Ms. DeMoss took intermittent FMLA leave in both 2019 and 2020.

96.     Throughout 2022 and 2023, Ms. DeMoss repeatedly requested a short leave of absence for her disabilities and serious health conditions.

97.     AT&T denied Ms. DeMoss's requests for a short leave of absence each time she requested it, including in March 2023.

98.     Each time Ms. DeMoss requested a short leave of absence for her disabilities in 2022 and 2023, AT&T simply denied the request, and did not attempt to engage in any interactive process with Ms. DeMoss.

99.     On both May 16, 2022 and May 26, 2022, Ms. DeMoss complained in writing to AT&T about its failure to engage in the interactive process.

13

100.    Ms. DeMoss took FMLA leave in April 2023 to care for her mother after her mother had hip surgery.

101.    After the layoff of the Center A employees, Ms. DeMoss applied for and was hired as a Home Expert by AT&T. Ms. DeMoss's first day as a Home Expert was June 19, 2023.

102.    The Home Expert position paid substantially less than Ms. DeMoss's job in Center A.

103.    In or around August 2023, AT&T falsely accused Ms. DeMoss of fraud related to the use of her work vehicle. After an investigation, the fraud allegation was unsubstantiated.

104.    The false accusation of fraud—which is a criminal offense—made Ms. DeMoss's working conditions so difficult or unpleasant that, as a reasonable person, Ms. DeMoss had no choice but to resign.

105.    AT&T's false allegation of fraud manifested an intent to force Ms. DeMoss to resign through an objectively intolerable work environment.

## COUNT ONE: RETALIATION IN VIOLATION OF
## THE FAMILY AND MEDICAL LEAVE ACT, 29 U.S.C. § 2601, *et seq.*
### *On Behalf of All Plaintiffs*

106.    Plaintiffs incorporate Paragraphs 1 through 105 above as if each has been fully stated herein.

107.    All three Plaintiffs availed themselves of a protected right under the FMLA.

108.    All three Plaintiffs suffered an adverse action when Defendant routed less-favorable customers to Center A, thus reducing their commissions; laid off all the Center A employees; refused to honor Plaintiffs' seniority rights to transfer to Center B; refused to consider Plaintiffs for vacancies in Center B; and failed to hire them for jobs that were either comparable, or nearly identical, to their former jobs.

14

109.     Ms. Bryant suffered additional adverse actions when Defendant falsely accused her of fraud; garnished her wages based on the false accusation of fraud; reported the garnishment to credit bureaus; surveilled her private social media accounts during her FMLA leave; issued her written warnings; used the untrue "fraud" accusation (which had been removed from her file) to justify not hiring her into vacant jobs in Nashville for which she was qualified; refused to hire her for the remote job; refused to hire her for the Center B job; and terminated her from her job in the collections department.

110.     Ms. DeMoss suffered an additional adverse action when Defendant falsely accused her of fraud and constructively discharged her.

111.     Ms. Davis suffered an additional adverse action when, out of the many jobs Ms. Davis applied for, Defendant only hired her for a position that paid less than her job at Center A—despite the availability of jobs that paid comparably to Ms. Davis's job in Center A for which she was qualified.

112.     There was a causal connection between the exercise of the Plaintiffs' rights under the FMLA and the adverse employment actions. In fact, management-level employees stated Center A employees could not be considered for various jobs because they took FMLA-qualifying leave.

113.     As a result of these actions, Defendant retaliated against Plaintiffs in violation of the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*

114.     As a result of Defendant's violations of the FMLA, Plaintiffs are entitled to back pay, interest on back pay, liquidated damages, other equitable relief, and reasonable costs and attorney's fees.

15

## COUNT TWO: INTERFERENCE IN VIOLATION OF
## THE FAMILY AND MEDICAL LEAVE ACT, 29 U.S.C. § 2601, *et seq.*
### *On Behalf of all Plaintiffs*

115.    Plaintiffs incorporate Paragraphs 1 through 114 above as if each has been fully stated herein.

116.    All three Plaintiffs were both "eligible employees" under the FMLA.

117.    AT&T was a covered employer under the FMLA.

118.    All three Plaintiffs were entitled to leave under the FMLA.

119.    All three Plaintiffs gave Defendant notice of their intent to take an FMLA-qualified leave.

120.    Defendant interfered with Ms. Bryant's FMLA rights by refusing to authorize FMLA leave for her pre-surgery doctor's appointment, by refusing to authorize the FMLA leave requested in her October 2022 Request, and by failing to notify Ms. Bryant of her Notice of Eligibility to and Rights and Responsibilities and/or Designation Notice within five business days of her requests for FMLA leave, as required by the FMLA.

121.    Defendant interfered with Ms. Davis's FMLA rights by discouraging her from using FMLA leave.

122.    Defendant interfered with Ms. DeMoss's FMLA rights by denying her request for leave.

123.    As a result of these actions, Defendant willfully violated Plaintiffs' rights under the Family and Medical Leave Act, 29 U.S.C. § 2601, *et seq.*

124.    As a result of Defendant's violations of the FMLA, Plaintiffs are entitled to back pay, interest on back pay, liquidated damages, other equitable relief, and reasonable costs and attorney's fees.

**COUNT THREE: DISCRIMINATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, *et seq.***
*On Behalf of Ms. Bryant*

125.    Plaintiffs incorporate Paragraphs 1 through 124 above as if each has been fully stated herein.

126.    Ms. Bryant was disabled within the meaning of the ADA.

127.    Ms. Bryant was otherwise qualified for her position, with or without a reasonable accommodation.

128.    Defendant knew or should have known about Ms. Bryant's disability.

129.    Ms. Bryant suffered an adverse action when Defendant falsely accused her of fraud; garnished her wages based on the false accusation of fraud; reported the garnishment to credit bureaus; and issued her written warnings.

130.    Defendant also subjected Ms. Bryant to unwelcome harassment because of her disabilities. The harassment was severe or pervasive, altered the conditions of Ms. Bryant's employment, and created an hostile work environment.

131.    Defendant took these adverse actions because of Ms. Bryant's disabilities.

132.    As a result of these acts and omissions, Defendant violated the ADA.

133.    As a result of Defendant's violations of the ADA, Ms. Bryant is entitled to compensatory damages in an amount to be determined at trial, back pay, interest on back pay, other equitable relief, and reasonable costs and attorney's fees.

**COUNT FOUR: DISCRIMINATION IN VIOLATION OF THE TENNESSEE DISABILITY ACT, TENN. CODE ANN. § 8-50-103, *et seq.***
*On Behalf of all Plaintiffs*

134.    Plaintiffs incorporate Paragraphs 1 through 133 above as if each has been fully stated herein.

135.     All three Plaintiffs were disabled within the meaning of the Tennessee Disability Act.

136.     Defendant knew or should have known about Plaintiffs' disabilities.

137.     All three Plaintiffs suffered an adverse action when Defendant routed less-favorable customers to Center A, thus reducing their commissions; laid off all the Center A employees; refused to honor Plaintiffs' seniority rights to transfer to Center B; refused to consider Plaintiffs for vacancies in Center B; and failed to hire them for jobs that were either comparable, or nearly identical, to their former jobs. Defendant also subjected Plaintiffs to unwelcome harassment because of their disabilities. The harassment was severe or pervasive, altered the conditions of Plaintiffs' employment, and created an abusive hostile work environment.

138.     Ms. Bryant suffered additional adverse actions when Defendant falsely accused her of fraud; garnished her wages based on the false accusation of fraud; reported the garnishment to credit bureaus; surveilled her private social media accounts during her medical leave; issued her written warnings; used the untrue "fraud" accusation (which had been removed from her file) to justify not hiring her into vacant jobs in Nashville for which she was qualified; refused to hire her for the remote job; refused to hire her for the Center B job; and terminated her from her job in the collections department.

139.     Ms. DeMoss suffered an additional adverse action when Defendant falsely accused her of fraud and constructively discharged her.

140.     Ms. Davis suffered an additional adverse action when, out of the many jobs Ms. Davis applied for, Defendant only hired her for a position that paid less than her job at Center A—despite the availability of jobs that paid comparably to Ms. Davis's job in Center A for which she was qualified.

18

141.     Defendant took these adverse actions because of Plaintiffs' disabilities.

142.     As a result of these acts and omissions, Defendant violated the TDA.

143.     As a result of Defendant's violations of the TDA, Ms. Bryant is entitled to compensatory damages in an amount to be determined at trial, back pay, interest on back pay, other equitable relief, and reasonable costs and attorney's fees.

**COUNT FIVE: RETALIATION IN VIOLATION OF THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, *et seq.***
***On Behalf of Ms. Bryant***

144.     Plaintiffs incorporate Paragraphs 1 through 143 above as if each has been fully stated herein.

145.     Ms. Bryant engaged in protected activity under the ADA when she requested reasonable accommodations for her disability and when she filed her first EEOC Charge.

146.     Ms. Bryant suffered adverse actions when Defendant falsely accused her of fraud; garnished her wages based on the false accusation of fraud; reported the garnishment to credit bureaus; issued her written warnings; and subjected her to a retaliatorily hostile work environment.

147.     There was a causal link between the protected activities and the adverse actions described above.

148.     As a result of these acts and omissions, Defendant violated the ADA.

149.     As a result of Defendant's violations of the ADA, Ms. Bryant is entitled to compensatory damages in an amount to be determined at trial, back pay, interest on back pay, other equitable relief, and reasonable costs and attorney's fees.

19

## COUNT SIX: RETALIATION IN VIOLATION OF THE TENNESSEE DISABILITY ACT, TENN. CODE ANN. § 8-50-103, *et seq.*
### *On Behalf of Ms. Bryant*

150.    Plaintiffs incorporate Paragraphs 1 through 149 above as if each has been fully stated herein.

151.    Ms. Bryant engaged in protected activity when she submitted a written complaint about Defendant's discriminatory actions on February 1, 2023.

152.    Ms. Bryant suffered an adverse action when Defendant terminated her from her job in Center A; refused to honor her transfer rights; refused to consider her for vacancies in Center B; failed to hire her for jobs that were either comparable, or nearly identical, to her former job; issued her written warnings; used the untrue "fraud" accusation (which had been removed from her file) to justify not hiring her into vacant jobs in Nashville for which she was qualified; refused to hire her for the remote job; refused to hire her for the Center B job; terminated her from her job in the collections department; and subjected her to retaliation and a retaliatorily hostile work environment.

153.    There was a causal link between the protected activities and the adverse actions described above.

154.    As a result of these acts and omissions, Defendant violated the Tennessee Disability Act, Tenn. Code Ann. § 8-50-103, *et seq.*

155.    As a result of Defendant's violations of the TDA, Ms. Bryant is entitled to compensatory damages in an amount to be determined at trial, back pay, interest on back pay, other equitable relief, and reasonable costs and attorney's fees.

## RELIEF REQUESTED

1.      A jury to try their claims.

2.      Entry of judgment in favor of Plaintiffs, and against Defendant, for compensatory damages in an amount to be proven at trial.

3.      Entry of judgment in favor of Plaintiffs, and against Defendant, for liquidated damages.

4.      Entry of judgment in favor of Plaintiffs for back pay, front pay, and other equitable relief.

5.      An award of Plaintiffs' costs, reasonable attorney's fees, and pre- and post-judgment interest.

6.      Any other legal or equitable relief to which Plaintiffs may be entitled.

<u>Dated:</u> June 24, 2024

Respectfully submitted,

**STEINER & STEINER LLC**

/s/ *Ann Buntin Steiner*

Ann Buntin Steiner, BPR No. 011697
613 Woodland Street
Nashville, Tennessee 37206
(615) 244-5063
asteiner@steinerandsteiner.com

**JESSE HARBISON LAW PLLC**

/s/ *Jesse Ford Harbison*

Jesse Ford Harbison, BPR No. 032105
P.O. Box 68251
Nashville, Tennessee 37206
(629) 201-7284
jesse@jesseharbisonlaw.com

*Attorneys for Plaintiffs*

21